## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

**FILED**

NOV - 7 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

SCOTT JOHNSTON,                              )
16857 Hummingbird Lane                       )
Cottonwood, CA 96022
Phone: 530-527-4000                          Case: 1:11-cv-01973
                                             Assigned To : Roberts, Richard W.
         Plaintiff, In Pro Se                Assign. Date : 11/7/2011
                                             Description: Pro Se Gen. Civil
    vs.

HONORABLE DAVID KAPPOS,                      )
in his official capacity as Under            )
Secretary of Commerce for Intellectual       )
Property and Director of the United States   )
Patent and trademark Office,                 )
                                             )
Mail Stop 8, Office of the Solicitor,        )
United States Patent and Trademark Office    )
P.O. Box 1450, Alexandria, VA 22313-1450     )
600 Dulany Street,                           )
Madison West Building, Room 8C43             )
Alexandria, VA 22314                         )
                                             )
         Defendant,                          )

## COMPLAINT

1.       This civil action is brought by Plaintiff Scott Johnston ("Johnston") against the Director

of the United States Patent and Trademark Office ("PTO") for a judgment that Johnston is entitled to a

patent pursuant to 35 U.S.C. §§ 145 and 306. Johnston, for his Complaint alleges as follows:

## THE PARTIES

2.       Johnston is, and at all relevant times mentioned in this complaint was a citizen of the

United States and a resident of the State of California. Johnston is the inventor of U.S. patent

1



RECEIVED
Mail Room

NOV - 7 20..

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

application number 11/374,563 (the '563 application), entitled "Horizontally Produced Large Diameter Spirally Formed Pipe". A true and correct copy of the '563 application is attached as Exhibit A.

3.    Defendant David Kappos is the Under Secretary of Commerce for Intellectual Property and Director of the PTO. The Director is the head of the agency, charged by statute with providing management supervision for the PTO and for the issuance of patents. He is sued in his official capacity.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this is a civil action arising under the laws of the United States and relating to patents, including the United States Patent Act. 35 U.S.C. § 1 *et seq.* This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 35 U.S.C. § 145.

5.    This Court has authority to review the decision of the PTO Board of Patent Appeals and Interferences ("BPAI") pursuant to 35 U.S.C. §§ 145 and 306. This Court has authority to order declaratory relief under 28 U.S.C. § 2201 in the controversy between this Plaintiff and Defendant.

6.    Venue is proper in this District pursuant to 35 U.S.C. §§ 145 and 306, and 28 U.S.C. § 1391(e).

## PROCEDURE

7.    This Complaint is timely filed pursuant to 35 U.S.C. § 145 and 37 CFR 1.304(a)(1). The BPAI decision on appeal (Appeal 2009-012974)("the '563 Decision"), was mailed May 26, 2011 and the Request for Rehearing ("RFR") was denied, and mailed on Sept. 16, 2011 ("the RFR Denial"). This matter has not been appealed to the United States Court of Appeals for the Federal Circuit.

## BACKGROUND

8.      The '563 application was filed March 11, 2006 as a continuation-in-part of application 09/312,992 ("the '992 application) filed May 17, 1999, claiming the benefit of provisional application 60/085,778 filed May 18, 1998.

9.      Johnston first appealed to the BPAI in the '992 application in July of 2001. The October 2002 decision (Appeal No. 2002-1520)('First Decision") reversed all rejections.

10.     The examiner reopened prosecution of the '992 application, including vertical Grain Silo and Tank references to support rejections under 35 U.S.C. §§ 102 and 103. All rejections were affirmed by both the BPAI (Appeal No. 2004-0533)("Second Decision") and the Court of Appeals for the Federal Circuit ("CAFC") (*In re Johnston*, 435 F.3d 1381 (Fed. Cir 2006)).

11.     The key issue of the Second Decision was the definition of the word "pipe" and the broadest reasonable meaning of this word as used in the claim language. The BPAI concluded that the claims as written, simply implied a geometric shape with a helical or spiral construction, and since Johnston had included Grain Silos in his specification as one of the possible uses for his new pipe, the Silo and Tank references were used to make the rejections.

12.     The PTO had essentially determined that Johnston had redefined what a "pipe" could be, then used that definition to defeat the '992 application.

13.     Johnston then filed the '563 application adding the term "Horizontally Produced" to the name and several of the claims. The language of the earlier claims were also combined. Each of the independent claims now include limitations that the pipe is corrugated or profiled with increased dimensional proportions as pipe size is increased. See Exhibit A pages 6 and 7 for a true and correct copy of the claims as considered in the '563 Decision.

14.     It required invention to create the pipe as claimed in the '563 application. Johnston is the

3

inventor of a Portable Spiral Pipe Manufacturing Machine, patent number 6,000,261 ("the '261 patent") and Large Diameter Arching Machine patent number 6,260,403 ("the '403 patent"). This issue is addressed on page 3 of the specification under the "Brief Summary of the Invention". (Exhibit A)

15.   For the '563 Decision, the PTO relied on the following prior art:

| Patent to | "Reed" | US Pat # | 2,751,672 | issued | June 26, 1956 | attached as | Exhibit B |
|-----------|--------|----------|-----------|--------|---------------|-------------|-----------|
| " | "McDonald" | " | # 3,380,147 | " | April 30, 1968 | " | Exhibit C |
| " | "McFatter" | " | # 4,121,747 | " | Oct. 24, 1978 | " | Exhibit D |
| " | "Steuber" | " | # 4,142,284 | " | Mar. 6, 1979 | " | Exhibit E |
| " | "Smith" | " | # 4,429,654 | " | Feb. 7, 1984 | " | Exhibit F |
| " | "Nethery" | " | # 4,729,198 | " | Mar. 8, 1988 | " | Exhibit G |
| " | "Carson" | " | # 5,768,928 | " | June 23, 1998 | " | Exhibit H |

"Handbook of Steel Drainage & Highway Construction Products," American
Iron and Steel Institute, 1983, pp. 6-65 (hereafter "Handbook")     attached as   Exhibit I

"PRD CORTEC Housing Manufacturing System," PRD Company, 1994
(hereafter "PRD")                                   attached as   Exhibit J

16.   Johnston provided the Handbook and PRD references to the PTO with the '992 application, and advised them in a declaration (December 2000) that he was a recognized authority in the art of Spiral Pipe Manufacturing Equipment, having worked as a Machinery Designer, Sales Engineer, CMP (Corrugated Metal Pipe) Sales Manager and Consultant for PRD Company (Pacific Roller Die Co. Inc.) from 1977 through 1997. He explained, at that time "there would be no spirally formed pipe, if there were no spiral pipe machinery."

17.   The '563 Decision, affirmed rejections of claims 1-3, 5-8, 12-14 & 16, and reversed the rejections of claims 4, 9 and 15 (pertaining to welded lockseams). Most, if not all of the rejections as presented by the examiner were modified by the '563 Decision, all of the rejections depend from either independent claim 1, 6 or 12 and with the exception of claims 5 and 16 pertaining to adding that the

4

pipe is reshaped into an arch shape the remaining claims will rise or fall based on the independent claims. The following rejections are the basis of the '563 Decision:

1.      Claims 1 and 12 were rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over McDonald in view of Smith.

2.      Claims 1 and 12 were rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over PRD in view of McFatter.

3.      Claims 5 and 16 were rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over PRD in view of McFatter as applied to claims 1 and 12 above and further in view of Handbook.

4.      Claim 6 was rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over PRD in view of Handbook and McFatter.

5.      Claims 1 was rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over Smith in view of McFatter and Carson.

6.      Claim 5 was rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over Smith in view of McFatter and Carson as applied to claim 1 above, and further in view of Handbook.

7.      Claim 6 was rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over Smith in view of McFatter, Carson and Handbook.

8.      Claim 12 was rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over Reed in view of Nethery.

9.      Claims 12 was rejected as unpatentable under 35 U.S.C. § 103(a) as obvious over Steuber in view of Nethery.

## COUNT ONE

### THE USE OF NON-ANALOGOUS ART IN SUPPORT OF
### REJECTIONS IS NOT IN ACCORDANCE WITH THE LAW

18.    Paragraphs 1 through 17 are re-alleged and reincorporated herein.

19.    The '563 Decision is improper under 35 U.S.C. § 103. This is particularly true when viewed in context with *In re Klein*, ___ F.3d ___ (Fed Cir. 2011) (2010-1411) (Serial No. 10/200,747). This cite was included in argument presented to the PTO in Johnston's RFR, but was not considered in the RFR Denial. Argument was presented to show new argument could be presented based upon a recent relevant decision in context with the fact that the scope and content of the subject matter had not been analyzed to determine who those skilled in the art actually are.

20.    Johnston also suggested this was not a new argument, that in each instance where these references were used he indicated that these combinations were the result of hindsight reasoning. The page limitation for a RFR made it impossible to fully develop the argument, but Johnston's Reply Brief (page 3) discussed the '261 patent and '403 patent, then offered the following statement:

"To completely understand, how *those skilled in the art* would view the appellant's

article, you would need to look at the appellant's patents. The appellant's machinery

is nothing like the equipment presented in the Reed, McDonald, Steuber and McFatter

references. This is clear, because these silo and tank references provide enough detail

to understand what *those skilled in the art* would know. This may be true of the Smith

reference as well, but the PRD, Handbook, and Nethery references, offer too little

information to have a complete understanding of the articles represented, and how their

made. The examiner is pretending to have valid rejections. Suggesting that teachings are

found, here or there, but not actually providing direct quotes, with page numbers and locations.

Creating theories out of thin air, based on circular reasoning, that are confusing to read and

6

often pointless, and even more disturbing, is the willingness to misquote or misrepresent

teachings of references and decisions. The appellant's brief contains accurate representations

of the references, and the claims."

For each of the rejections, in both his Appeal Brief and Reply Brief, Johnston explained the teachings

of the references and explored the concepts of modification that would need to be considered if a

genuine combination were possible and then concluded with comments like; "these references logically

have nothing to do with each other." This was done prior to stating that the combination was the result

of "hindsight knowledge."

21.     While Johnston did not specifically use the term Non-Analogous, or state specifically

that the references were from a different field of endeavor, it is clear this was his intent. He presented

argument that the references were completely unrelated and as such the non-analogous art argument

was before the PTO prior to rendering the '563 Decision.

22.     The RFR Denial indicated that the Non-Analogous arguments were not before them

prior to the '563 Decision, but nonetheless, disagreed that the teachings of McFatter, Steuber, Netherly,

Mcdonald and Reed were not analogous art because they teach of vertical silos and tanks.

23.     The independent claims each include that the "wall is corrugated or profiled." The

Handbook reference illustrates that corrugated metal pipe has been in existence for a very long time

and the Carson reference (Background of the Invention, Col. 1) discloses that various profiles are now

available. These profiles are located intermediate to the seams and provide for improved hydraulic

performance. The examiner understood the purpose of this wall limitation, on page 32 of his answer it

says "corrugating pipe structure for strength when buried in the ground", but this wall limitation also

adds rigidity to the pipe. The Handbook reference (page 46) teaches these pipes are shop fabricated,

and the '563 application on page 4 indicates, "pipe may be placed vertically and used as a grain silo,"

which inherently requires the pipe to have structural properties to be handled and repositioned.

24.     A determination regarding the scope of the claimed subject matter, would have resulted in a better understanding of who those skilled in the art actually are. Based on the above analysis, we know that this invention relates to an old and well known industry. In general, those skilled in the art have a background in corrugated metal pipe manufacturing.

25.     Johnston's invention as claimed solves the problem of providing an economical and efficient way of building a variety of structures, utilizing a new pipe innovation from a field where those skilled in the art are involved in producing storm drain and culvert pipes. The PTO attempts to redefine the problem addressed by Johnston as a silo or tank, similar to all silos and tanks.

26.     The fact, that these silo and tank references were not considered by the PTO for the first three years of prosecution in '992 application, runs contrary to any obviousness arguments.

27.     The examiner comments on page 26 of his answer, "the suggestion that one skilled in the art would form the horizontal pipes in the Handbook using vertical methods would be counter intuitive". Then in the next sentence he adds the idea, "rather than trying to form an indefinite length tube vertically".

28.     This shows that the PTO clearly recognized the vertical references did not commend themselves to the attention of a person skilled in the art of corrugated metal pipe manufacturing.

29.     The PTO failed to show by substantial evidence that references were analogous art. They did not offer any argument that the cited references were "reasonably pertinent" to the problem solved by Johnston. *In re Klein, supra, In re Icon Health & Fitness, Inc.,* 496 F.3d 1374, 1378 (Fed. Cir. 2007) and *In re Clay,* 966 F.2d 656, 659 (Fed. Cir. 1992).

30.     Based on all of the above, the Reed, McDonald, Steuber, McFatter, Smith and Nethery references are non-analogous art to Johnston's invention. These references are not related to those skilled in the art of corrugated metal pipe manufacturing. The PTO has only offered that these references are related to the construction of silos or storage tanks.

8

31.     Each of the rejections identified in paragraph 17 above, rely on at least one of these references and because of this, all of the rejections of the '563 Decision are invalid. In accordance with 35 U.S.C. § 103(a) a patent may not be obtained if the invention was "obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Johnston made it clear, from early on, that he was a recognized authority in the art of Spiral Pipe Manufacturing Equipment, involved with corrugated metal pipe manufacturing and invented machinery specifically in this field. He provided the Handbook and PRD references to the PTO, and the Carson reference is consistent with these references. These references are related to the manufacture of corrugated metal pipe, and the newer profiled versions of this pipe.

32.     The above establishes PTO unlawful use of non-analogous art. The plaintiff requests judgment in his favor and relief in accordance with his prayer as found at the end of this complaint.

## COUNT TWO

### THE '563 DECISION IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH THE LAW

33.     Paragraphs 1 through 32 are re-alleged and reincorporated herein.

34.     As indicated above, from the quote included in paragraph 20, the '563 Decision was based on the examiner's unsupported theories, misquotes and misrepresentations of teachings from the references and decisions.

35.     The PTO endorsed the examiner's theories, when beginning to discuss the obviousness rejections, stating "we agree with the Examiner that the orientation of the structure as it's produced does not structurally limit the final product." Then continued; "Moreover, once the PTO has made out a prima facie case that the appellant's claimed product and the product of the prior art appear to be reasonably the same, the burden shifts to the applicant to prove otherwise" (the '563 Decision, page 7).

9

36.    In making this determination, the PTO did not just take a look at the references as implied. They went on to explore the concept of horizontal production some more, determined the references did not need to teach both a corrugated and a profiled wall, offering that they consider McDonald's offset for welding to be a profiled wall. They theorized that increasing dimensional proportions as pipe size is increased was merely a choice of mechanical expedients. Then defended the combination with Smith some, even though they had previously determined horizontal production was irrelevant. Then finally, concluded any inherent limitation of independence, was met by McDonald disclosing "building structures" not just silos. For us to agree that the PTO had made out a "prima facie case", we must understand and agree with all of the above, simply by looking at these references.

37.    This was a burden shifting scheme designed to avoid actually dealing with Johnston's arguments and evidence. The PTO embellished the examiner's theories, then asserted Johnston failed to prove these wrong.

38.    The Independent claims each include that the "wall is corrugated or profiled." The PTO recognizes the Handbook, PRD and Carson references teach this limitation, and from the examiner's comments as mentioned in paragraph 27 above, we know the PTO understood these references represent horizontally produced products.

39.    Johnston presented evidence that this wall limitation resulted in a pipe that inherently has structural properties to be handled and repositioned, see paragraph 23 above.

40.    On page 6 of his Reply Brief, Johnston indicated that if the silo of the McDonald reference were placed on it's side, it would likely collapse from it's own weight. Then went on to explain "Fig. 1-1 of the Handbook reference (page 39) provides a demonstration of how corrugations increase the beam strength of material." The demonstration utilized a deck of playing cards, Johnston concluded "Both cards may be capable of being stood on edge to build a card house, but only the card with the corrugations is suitable for horizontal use as a poker chip bridge."

41.    The examiner's final rejection indicated from his answer near the bottom of page 5 that U.S. Patent 4,621,972 to Grotte (Nov. 11, 1986) disclosed an apparatus to lift a horizontal silo to it's final vertical disposition. The reference is titled "Silo Mover", and starting on column 2, line 19 it states "interior braces are placed on the interior of the silo, the braces, as shown, comprise spiders which will prevent the silo from flattening or becoming egg shaped."

42.    The arguments above suggest the PTO, when presented with the inherent limitations of the pipe as claimed, intentionally deflected attention to the value of horizontal production. These pipes are inherently independent articles of manufacture with inherent structural properties to be handled and repositioned as needed and can even be considered inherently horizontally produced.

43.    Claims 1 and 6 include the term "horizontally produced", while claim 12 does not, the "Title of Invention" does, and the description within the specification does, and reference to the '261 patent, on review, makes it clear that this claim inherently includes this limitation.(the '563 application)

44.    In the RFR, Johnston states; "The examiner's argument about the welding offset was not fully developed, it's still unclear. The welding offset is a seam, it doesn't perform the function of a profile. The seam, has a height of two thicknesses of material, welded on both sides. When considering that a profile is formed intermediate to the seams and logically has greater height, the differences are impossible to reconcile." See paragraph 23 above, discussing the Carson reference "profiles are located intermediate to the seams". The RFR Denial did not consider this argument.

45.    On page 9 of the RFR Johnston stated; "Throughout the examiner's answer arguments were presented suggesting that increasing dimensional proportions, was merely a choice of mechanical expedience. In support of this, the BPAI suggested it was obvious to increase the wall thickness to improve "hoop strength (which determines the burst strength of the pipe)" Johnston advised, "Water simply flows through these pipes, very low pressures are involved, bursting is never an issue." In their RFR Denial on pages 7 and 8 the PTO admits this may not relate to storm drain and culvert pipes,

11

defending their position by stating "McDonald, the prior art the Examiner proposed to modify, is not directed to storm drain and culvert pipes." They suggested "*KSR* 550 U.S. At 418-19" now allows "inferences and creative steps that a person of ordinary skill in the art would employ." Then went on to say their theory "was merely an example explaining why they agreed with the Examiner's position".

46.     The examiner never explained his theory. He implied it was supported by the Handbook, but never said how. The BPAI admitted their theory might be wrong, but they agree with the examiner. The PTO has not identified the "inferences and creative steps that a person of ordinary skill in the art would employ." So far, all we have from the PTO is their unsupported and unexplained opinions.

47.     These PTO opinions were focused on the material thicknesses. They did not consider the depth and pitch (size) of the corrugations or profiles would be increased as well.

48.     The actual reason for increasing dimensional proportions is disclosed by Johnston on page 3 of the '563 application under "Brief Summary of the Invention" following a discussion of the '261 and '403 patents it states, "with lock seam technology and deeper corrugation profiles it is possible to produce larger diameter sizes than any other pipe manufacturing technology. Pipes up to 100 foot in diameter or more are well within the range that this new equipment could be utilized to produce."

49.     The PTO unsupported opinions fail to consider the actual purpose of the limitation, proving the limitation was not obvious. The PTO utilized the same "mechanical expedience" theory (opinion) throughout the '563 Decision in making each rejection of the independent claims.

50.     Thus far, in this Complaint we have dealt with issues that were presented to the PTO in Johnston's RFR. It is clear that non-analogous art, bogus theories and misrepresentations of teachings from the prior art were used to make all of the rejections. The '563 Decision was based on an arbitrary, capricious and unprofessional approach to analyzing the '563 application. It represents an abuse of discretion and is otherwise not in accordance with the law.

51.     These problems are developed and proven further when considering the specific

rejections and combination of references utilized in the '563 Decision. The PTO followed a similar pattern for all of the rejections. As the quote from paragraph 35 above suggests, when they used the phrase, "claimed product and the product of the prior art appear to be reasonably the same" they were indicating the criteria used. All of the rejections were based on appearances alone.

52.    For the McDonald in view of Smith rejections, Johnston stated in his Reply Brief on page 10; "The grounds of rejection and response to argument, offer no actual discussion of teachings from the Smith and McDonald references regarding fabrication techniques, it is simply implied that "such is an equivalent manner of forming the helically formed pipe." The '563 decision page 9 last paragraph discussed "use of a known technique to improve a similar device" suggesting that the examiner had provided the "rational underpinning".

53.    On page 11 of his Reply Brief Johnston debunked this "rational underpinning" when among other things, he said "Smith is horizontally produced in a body of water, which is suggested as the basis for saving freight costs. How does this apply to McDonald's land based vertically produced article?" The '563 Decision endorsed the examiner's position and offered no comments to Johnston's arguments.

54.    Even if we assume the PTO position was to consider just the products of the McDonald and Smith references, an analysis of each product would need to be made. For example; McDonald offers a single wall spiral shape welded on each side of a small offset, which helps hold the shape together for vertical welding, and Smith is a double wall, multiple component structure resulting from a continuous fabrication process, where components are added in layers. It is horizontal, but this is the result of being a double wall hollow structure that can float. For this combination to be obvious, someone needs to explain the technique, learned from Smith to improve McDonald and how that would work to make Johnston's pipe. Absent this explanation the combination is not obvious.

55.    For the PRD in view of Mcfatter rejections, Johnston's Reply Brief states on page 13,

13

"The Handbook, PRD and the appellant refer to spirally formed pipe as those who are skilled in the art. They are aware of the equipment used to produce these pipes, the machinery used to manufacture these articles is not discussed. McFatter's equipment, while unique is not similar in any way. This is particularly relevant to the examiner's assumptions regarding using known techniques to improve similar devices, without actually researching the techniques and devices of both references there is no basis to draw such a conclusion." The '563 Decision does not address this argument.

56.     In this case the PRD reference does not provide any detail regarding it's manufacture, there is no way to analyze how improvements would be made. This product is shown in a horizontal position, and there is text indicating it's corrugated, can be made up to 15 feet in diameter, and "PRD's spiral mill applies the latest in corrugation technology" including lockseams. We must assume PRD's spiral mill, horizontally produces spirally formed pipe with corrugations. Johnston readily admits that it does, but he also says "McFatter's equipment, while unique is not similar in any way."

57.     Without understanding how spiral pipe mills work, you can not suggest you understand a new product is obvious (can be produced on a spiral pipe mill), based some other kind of product and machine that you think you do understand.

58.     This idea is particularly absurd when you consider the PTO combines the PRD reference with the Handbook throughout the '563 Decision as being directly related, and the examiner stated, "the suggestion that one skilled in the art would form the horizontal pipes in the Handbook using vertical methods would be counter intuitive." (see paragraph 27 above)

59.     For the PRD in view of McFatter and Handbook rejections, the claims include the limitation that the "pipe is reshaped into an arch shape." The Second Decision in the '992 application reversed rejection of all claims (1-9) based on the combination of Handbook in view of McFatter. (page 22) These current rejections include the PRD reference, and based on the comments above regarding the PRD reference, there would be no substantive difference. Johnston's Reply Brief page 15

14

included this argument, but it was not addressed by the PTO in the '563 Decision.

60.    For the Smith in view of McFatter and Carson rejections, the examiner's grounds of rejection (answer pg 9-10) indicates Smith teaches all the recited structure, with the exception of corrugations, a lockseam and specific diameter. That it would have been obvious to modify Smith to include corrugations and lockseams as suggested by Carson and provide for a larger diameter as suggested by McFatter. When the Handbook reference is included for the rejection of independent claim 6 there is substitution of Handbook for Carson, and for claims 5 and 6 the Handbook is used for teaching the arched shape modification.

61.    Johnston's Reply Brief states on page 18, " If Smith, were modified to be a giant single wall corrugated pipe, it would no longer be a floating double wall structural vessel. *If proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, then there is no suggestion or motivation to make the proposed modification.* In re Gordon, 733 F.2d 900, 221 USPQ 1125 (Fed. Cir. 1984)."

62.    In addressing this the '563 Decision (page 18) states; "We are not persuaded by Appellant's first argument because it does not address the Examiner's proposed combination. The Examiner is not proposing to modify the double wall structure of Smith according to the single-wall structure of McFatter".

63.    Based on the grounds of rejection as discussed in paragraph 60 above, Smith was expected to learn the single wall corrugation structure from Carson or Handbook, only the diameter was being learned from McFatter. The Smith reference must become a single wall corrugated or profiled pipe before it can begin to meet the claims limitations. For this to happen it would no longer be a double wall structural vessel. The PTO missed the point completely, and no obviousness rejection is possible based on these combinations.

64.    For the rejections of Reed in view of Nethery and Steuber in view of Nethery, the

examiner in his answer on page 34 states; "Nethery is simply being used to show that it was known in the art of silos that corrugated walls are known to be used, nothing else." Johnston's Reply Brief (page 22) stated; "Silos, as shown in the Nethery reference are produced from bolted together corrugated plates, there is no forming process involved." The PTO did not address this issue.

65.    While it may be understood how spiral shapes are created using Reed or Steuber, you can not suggest a new product is obvious (can be created using Reed or Stueber), based on another product that you do not understand. Nethery simply does not provide the information you would need to know. It provides no more information than driving on the highway past a silo on a farm.

66.    Paragraphs 51-65 prove, that in addition to the allegations regarding the use of non-analogous art, bogus theories and misrepresentations, the rejections presented within the '563 Decision are totally without merit and are based on an arbitrary, capricious and unprofessional approach to analyzing the '563 application. It represents an abuse of discretion and is otherwise not in accordance with the law. The plaintiff requests judgment in his favor and relief in accordance with his prayer as found at the end of this complaint.

## COUNT THREE

## SECONDARY CONSIDERATIONS

67.    Paragraphs 1 through 66 are re-alleged and reincorporated herein.

68.    It is well established from *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 2D 545 (1966) through the *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) decision "secondary considerations" must be considered when evaluating questions of obviousness.

69.    Johnston, as discussed in paragraphs 16 and 31 above, is a recognized authority in the art of Spiral Pipe Manufacturing Equipment, involved with corrugated metal pipe manufacturing. This was discussed above, when considering that the scope and content of the subject matter had not been

analyzed by the PTO to determine who those skilled in the art actually are. (Paragraphs 19, 24 and 31 above).

70.    Based on Johnston's professional background, a person of ordinary skill in the art of corrugated metal pipe manufacturing would not have the requisite knowledge to develop machinery. As a machinery designer specifically in the field of corrugated metal pipe manufacturing equipment, only a handful of people in the world would possess the specific knowledge to be in the position to have invented his claimed "Horizontally Produced Large Diameter Spirally Formed Pipe."

71.    As indicated from the paragraphs cited above, the PTO was aware of Johnston's authority status from December of 2000. This was also implied in the '563 application and Johnston's Reply Brief, when he advised of his patented machinery. For the PTO to completely ignore this issue, as they did, represents a absolute failure on their part to be objective.

72.    A separate, but related issue is that it required invention to invent the "Horizontally Produced Large Diameter Spirally Formed Pipe" as claimed. This issue has been before the PTO from Johnston's provisional application in 1998 through the filing of this complaint. This too, has been completely ignored by the PTO.

73.    Throughout the prosecution history of Johnston's applications regarding his new pipe the PTO asserted rejections based on references pertaining to various unrelated manufacturing processes. The PTO never compared these, with the processes disclosed by Johnston's patents. The PTO has not even acknowledged Johnston's patents exist relative to his new pipe.

74.    Also, throughout this history Johnston has presented arguments to the PTO regarding the advantages of his claimed pipe. For example: "The appellants' spirally formed pipe as claimed (because it is claimed independent of any specific use) has the *distinct advantage* of being an independent article of manufacture, it is capable of being used to build a grain silo in addition to the various uses as disclosed in the appellants' application. The McDonald reference does not share this ability." (Reply

17

Brief, page 10)

75.     In the '563 Decision on page 10, the PTO dismissed this argument stating, "We find Appellant's argument unpersuasive because as the Examiner noted, McDonald discloses "building structures" and a silo is merely an example."

76.     The '563 application on page 4 describes, and Fig 1 of the drawings show, highway overpasses, barns or storage buildings and homes are among the uses of this new pipe. This is in addition to grain silos and storage tanks. It is inconceivable that McDonald's alleged "building structures" envisions these concepts.

77.     On a "prima facie" basis, people readily recognize additional advantages. Underground buildings (shelters, wine cellars and mushroom farms), advantages related to weather problems, resistance to hurricanes, tornadoes and snow loads are considered. For many situations this pipe offers economically, environmentally and seismically superior solutions, within a number of completely unrelated industries.

78.     The PTO has made no objective attempt to consider this issue.

79.     These allegations provide, three separate and valid "secondary considerations" that have been before the PTO for a quite some time, being completely ignored or dismissed with little consideration. Just one of these issues alone, is enough to invalidate the obviousness rejections.

80.     In the past six months Johnston has also learned that North America's only corrugated metal pipe machinery builders (PRD Company of California, and Ironside Design Manufacturing of Canada) have each sold or leased mobile machinery with tooling for deeper corrugations and diameters above 16 feet within the United States, and two of the largest pipe manufactures in America (Contech Construction Products of Ohio and Pacific Corrugated of California) are using this equipment to produce products which infringe the '563 application.

81.     On further investigation Johnston concluded that this infringement began sometime

within the past five or six years.

82.     Competitors use of the claimed invention beginning sometime around 2005 or 2006 is evidence that the invention was not obvious at the time Johnston filed his application. It also indicates that these competitors were emboldened by the PTO delay in issuing this patent.

83.     This last issue is most disturbing to the plaintiff and as indicated in paragraph 79 above, just one of these issues alone, is enough to invalidate the obviousness rejections. The plaintiff requests judgment in his favor on this issue and relief in accordance with his prayer as found at the end of this complaint.

## COUNT FOUR

## UNREASONABLE DELAY

84.     Paragraphs 1 through 83 are re-alleged and reincorporated herein.

85.     Individuals wishing to obtain a patent, file an application and have an expectation that if patentable subject matter is disclosed the PTO will issue a patent within just a few years. In fact, the PTO routinely issues most patents within three years, this in the basis of the 20 year patent term.

86.     The provisions established in 35 U.S.C. § 154(b) are wholly inadequate to address the nature of the delays Johnston has experienced in this matter, and to the extent this court has statutory authority under 5 U.S.C. § 706 to review all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action, this court can address this issue.

87.     These provisions assume the PTO will operate in a transparent and fair manner. That any delay based on simple disagreements and mistakes will ultimately be credited to the prevailing party through the petition process. The problem is, this also assumes long term delays, involving

continuation applications and multiple appeals must be the fault of the applicant.

88.   Johnston had an expectation that his patent would issue sometime around January 2003 based on the First Decision in the '992 application. He would have been able to petition for a little over 400 days extension and taking into account his provisional application, would have had a patent term of nearly 17 years from that date.

89.   Apart from the diameter change from 15 to 16 feet, the combined teachings of claims 12 through 16 in the '563 application are identical to the combined teachings of claims 1 through 9 in the '992 application, and as such were well within grasp of the PTO to suggest or even offer an amendment to place the application in condition for allowance in October of 2002.

90.   Johnston, routinely requested the constructive assistance and suggestions of the examiner pursuant to M.P.E.P. § 706.03(d) and § 707.07(j), but was never given any help.

91.   In this case the PTO decided early on they did not want to issue this patent. It even appears they held contempt for Johnston as a self represented individual and regularly presented him with nonsensical arguments. Possibly in the hopes he would just give up.

92.   The '563 application is key to a viable commercial venture that Johnston has been working on for thirteen years (www.thepipeman.net). He had been waiting for this patent to issue, as the basis of obtaining the best terms with potential investors. Ultimately deciding last year he could no longer wait, he began contacting venture capital firms, investment bankers and related industries. Over ten thousand contacts were made.

93.   Then, as discussed above in paragraph 80, Johnston learned competitors were using his invention and has concluded this is the reason the search for an investor has been unfruitful. The PTO while not having any direct connection to any of these issues, is responsible for hindering Johnston's ability to succeed in this endeavor.

94.     Johnston has also spent a small fortune in his efforts to obtain this patent and has been paying maintenance fees on the '261 and '403 patents without receiving any benefit. Based on government immunity provisions the PTO can not be held liable for these losses, but they certainly could wave the issue fee for the '563 application, based on monies already collected.

95.     Johnston was 42 years old when he first filed the provisional application for this invention. He is 55 years old now. This has been a very long, costly experience and the PTO is responsible for all of this delay. The plaintiff requests judgment in his favor on this issue and relief in accordance with his prayer as found at the end of this complaint.


## CONCLUSION

96.     Johnston redefined what a "pipe" could be and was denied a patent because of this. From the time Silo and Tank references were first introduced, Johnston made it clear these references were unrelated (non-analogous) to those skilled in the art of spiral pipe manufacturing. Throughout the '563 Decision, not only did the PTO use non-analogous art for each rejection, but utilized unsupported theories and misrepresentations to complete each rejection. From 2000 to the present the PTO was aware Johnston was an authority in the field of spiral pipe machinery design and had explained that his invention was itself, the result of invention based on his '261 and '403 patents. From early on the PTO was made aware that Johnston's invention provided for significant advantages over the prior art, but even this was dismissed with little thought. Then after this nightmare of endless delay, Johnston learned that competitors had stolen his idea and possibly any hope of getting an investor. The PTO is responsible for the delay and must compensate Johnston with an appropriate patent term adjustment and although they can not be held liable for damages they can wave the issue fee for this patent.

## PRAYER FOR RELIEF

WHEREFORE, Johnston respectfully requests that this Court:

A.     Declare, adjudge and decree that the PTO decision in Appeal 2009-012974

        regarding Application 11/375,563 is erroneous, contrary to law and is reversed.

B.     Direct the PTO to issue a Notice of Allowance for this Application.

C.     Direct the PTO to wave the issue fee.

D.     Direct the PTO to issue Johnston a patent on this Application.

E.     Direct the PTO to issue an order of patent term adjustment, providing for a sixteen (16)

        year term based on the date of issue.

F.     Grant such other and further relief as the Court deems appropriate.


I have personal knowledge of the foregoing facts, except those alleged on information and belief and if called as a witness, can and will competently testify to them under oath.

I declare (or certify, verify or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this complaint was executed at Cottonwood, California.

Executed this 3rd day of November 2011.

_____
Scott Johnston

Dated: November 3, 2011

Respectfully Submitted,

SCOTT JOHNSTON
16857 Hummingbird Lane
Cottonwood. CA 96022
530-527-4000
Plaintiff In Pro Se

By: _____
Scott Johnston , In Pro

CERTIFICATE OF SERVICE

David Johnston declares as follows:

I am over 18 years of age, and not a party to the within action.
I reside at 16857 Hummingbird Lane, Cottonwood, California 96022.

On November 3, 2011  I served the document(s) below:

**PLAINTIFF SCOTT JOHNSTON'S;**

Personal Check #1222 for $350 filing fee, Civil Cover Sheet, Summons for
David  Kappos (Director of the USPTO), Summons for The U.S. Attorney
General, Summons for the U.S. Attorney for the District of Columbia,
Form AO 120, Original Complaint with Exhibits A through J attached,
Copy of Original Complaint with Exhibits A through J attached, four (4)
Copies of the Original Complaint without attachments, CD-R with .pdf files
of Exhibits A – J, Transmittal Letter, Prepaid return envelope and This
Certificate of Service

BY MAIL – Placing the original or a true copy thereof enclosed in a sealed envelope
            with postage fully prepaid in the United States Mail at the Post Office on
            Ferry Street in Anderson, California.

ADDRESSED TO:

> United States District Court
> for the District of Columbia
>
> **Office of the Clerk**
> 333 Constitution Avenue, NW
> Washington, DC 20001

I declare under penalty of perjury under the laws of the State of California that the forgoing
is true and correct. Executed at Anderson, California on November 3, 2011.


_____
David Johnston